[No. S085212. June 1, 2000.]

JAMES W. OBRIEN et al., Petitioners, v.
BILL JONES, as Secretary of State, etc., et al., Respondents.

**COUNSEL**

Kerr & Wagstaffe, James M. Wagstaffe and Timothy J. Fox for Petitioners.

Hansen, Boyd, Culhane & Watson, Kevin R. Culhane and Betsy S. Kimball as Amici Curiae on behalf of Petitioners.

Robert C. Fellmeth for the Center for Public Interest Law as Amicus Curiae on behalf of Petitioners.

Jerome Fishkin; Law Offices of Ephraim Margolin, Ephraim Margolin, Gerald Uelman and Vicki H. Young as Amici Curiae on behalf of Petitioners.

Bill Lockyer, Attorney General, Manuel M. Medeiros, Assistant Attorney General, Andrea Lynn Hoch and Daniel G. Stone, Deputy Attorneys General, for Respondents Governor Gray Davis, Senate President Pro Tempore John Burton and Speaker of the Assembly Antonio R. Villaraigosa.

William P. Wood, Oliver S. Cox and Pamela S. Giarrizzo for Respondent Secretary of State Bill Jones.

Jerome Berg, in pro. per., as Amicus Curiae on behalf of Respondents.

**OPINION**

**GEORGE, C. J.**—From the creation of the State Bar Court in 1988 until the present, Business and Professions Code sections 6079.1, subdivision (a), and 6086.65, subdivision (a), have provided that this court appoints all judges of the State Bar Court. Revised versions of these statutes, operative November 1, 2000, provide that of the five judges of the State Bar Court Hearing Department (hereafter Hearing Department), two judges shall be appointed by this court, one by the Governor, one by the Senate Committee on Rules, and one by the Speaker of the Assembly. The revised statutes further provide that all three judges of the State Bar Court Review Department (hereafter Review Department) shall continue to be appointed by this court, but that the current lay judge of the Review Department shall be replaced by a judge who is a member of the State Bar.

Petitioners James W. Obrien, H. Kenneth Norian, and Nancy R. Lonsdale previously were appointed by this court as judges of the State Bar Court, and currently are serving in that capacity. On January 19, 2000, they filed this original proceeding in this court, seeking a writ of mandate, prohibition, or certiorari, or other appropriate relief, to preclude respondents Governor, Senate President Pro Tempore (who also serves as chair of the Senate Committee on Rules), and Speaker of the Assembly from appointing any judges of the State Bar Court, and to prohibit respondent Secretary of State from accepting for filing the oaths of office administered in connection with any such appointments. Petitioners further seek a declaration that the statutory revisions described above violate the separation of powers provision of the Constitution. (Cal. Const., art. III, § 3.)

Because uncertainty regarding the effect of the revised statutes might cast doubt upon the legitimacy of disciplinary recommendations rendered by judges appointed pursuant to those provisions, we issued an order to show cause on March 1, 2000, and established an expedited briefing and oral argument schedule to permit the court to resolve the matter prior to the appointment of individuals who will occupy the positions currently held by

judges whose terms expire on November 1, 2000. The petition is opposed collectively by the Senate President Pro Tempore and the Speaker of the Assembly (hereafter respondents). The Governor and the Secretary of State take no position on the merits.

We conclude that although this court's inherent authority over attorney admission and discipline includes the power of this court to appoint the judges of the State Bar Court and to specify their qualifications, other appointment mechanisms specified by the Legislature are permissible so long as they are subject to sufficient judicially controlled protective measures to ensure that such appointments do not impair the court's primary and ultimate authority over the attorney admission and discipline process. As we shall explain, because of our continuing primary authority over the operations of the State Bar Court—including the appointment of that court's judges—and the numerous structural and procedural safeguards, described herein, that exist both within the attorney discipline system and within the State Bar Court appointment process established by this court, we conclude that the legislation here at issue, providing that some of the hearing judges shall be appointed by the executive and legislative branches and that the lay judge of the Review Department shall be replaced with a judge who is a member of the State Bar, does not defeat or materially impair our authority over the practice of law, and thus does not violate the separation of powers provision.

I

Until 1988, the State Bar's attorney disciplinary system was operated primarily with the assistance of volunteers from local bar associations. (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 611 [79 Cal.Rptr.2d 836, 967 P.2d 49] (*Attorney Discipline*).) These volunteers and other individuals appointed by the bar's board of governors acted as referees and made recommendations to the board, which in turn made recommendations to this court regarding the discipline of attorneys. (Bus. & Prof. Code, § 6078;[1] *In re Rose* (2000) 22 Cal.4th 430, 438 [93 Cal.Rptr.2d 298, 993 P.2d 956] (*Rose*).)

In 1988, the Legislature directed the board to establish a State Bar Court that would assume the board's disciplinary functions. (§ 6086.5.) The State Bar Court includes a Hearing Department and a Review Department. (§§ 6079.1, 6086.65.) Pursuant to rules promulgated by the bar, hearing judges conduct evidentiary hearings on the merits in disciplinary matters and render written decisions recommending whether attorneys should be disciplined. (*Rose, supra*, 22 Cal.4th at p. 439.) A decision of the Hearing

---

[1] Further undesignated statutory references are to the Business and Professions Code.

Department is reviewable by the Review Department at the request of the disciplined attorney or the State Bar. (*Ibid.*) The Review Department independently reviews the record and may adopt findings, conclusions, and a decision or recommendation at variance with those of the hearing judge. (Cal. Rules of Court, rule 951.5, adopted Feb. 28, 2000;[2] see § 6086.65, subd. (d) [specifying an alternative standard of review "[u]nless otherwise provided by a rule of practice or procedure approved by the Supreme Court"].)

A recommendation of suspension or disbarment, and the accompanying record of the proceedings in the State Bar Court, are transmitted to this court after the State Bar Court's decision becomes final. (§ 6081; *Rose, supra,* 22 Cal.4th at p. 439.) The affected attorney or the State Bar Chief Trial Counsel may file a petition requesting that this court review, reverse, or modify the recommended discipline. (§§ 6082, 6083; rules 952(a), 952.5.) We independently examine the findings and conclusions of the State Bar Court in light of the entire record and determine whether to impose the discipline recommended by the State Bar Court. (*Rose, supra,* 22 Cal.4th at pp. 439, 456-457.)

Pursuant to statutes and rules of court, this court has appointed the judges of the State Bar Court and has prescribed the evaluation and nomination process. Thus, under presently applicable law, we appoint the Presiding Judge of the State Bar Court and five hearing judges for terms of six years, subject to reappointment by this court for additional six-year terms. (§ 6079.1, subd. (a).)[3] Although this statute requires the appointment of no fewer than seven hearing judges, we have ordered that only five hearing judges be appointed, as recommended by the presiding judge, in light of the State Bar Court's caseload. We also appoint the Review Department, consisting of the presiding judge of the State Bar Court, one lay judge, and one attorney judge. (§ 6086.65, subd. (a).)[4]

---

[2]Further undesignated rule references are to the California Rules of Court.

[3]Section 6079.1, subdivision (a), operative until November 1, 2000, states: "The Supreme Court shall appoint a presiding judge of the State Bar Court and no fewer than seven hearing judges, and any additional hearing judges as may be authorized by the Legislature, to efficiently decide any and all regulatory matters pending before the Hearing Department of the State Bar Court. The presiding judge and all other judges of that department shall be appointed for a term of six years and may be reappointed for additional six-year terms. Any judge appointed under this section shall be subject to admonition, censure, removal, or retirement by the Supreme Court upon the same grounds as provided for judges of courts of record of this state." (Stats. 1999, ch. 221, § 2.)

[4]Section 6086.65, subdivision (a), operative until November 1, 2000, states in relevant part: "There is a Review Department of the State Bar Court, which consists of the Presiding Judge of the State Bar Court, one Lay Judge, and one Review Department Judge. The judges of the

Section 6079.1, subdivision (c), provides that the State Bar Board of Governors shall screen and rate all applicants for appointment or reappointment, unless otherwise directed by the Supreme Court. We have chosen not to utilize the board for this purpose and instead to appoint a seven-member Applicant Evaluation and Nomination Committee to solicit, receive, screen, and evaluate all applications for appointment or reappointment to the State Bar Court after considering factors specified by statute and by rule 961(b)(2). The committee then rates all applicants and nominates for each vacancy at least three candidates who, in the committee's view, possess the qualifications necessary to perform the duties of a State Bar Court hearing judge or review judge. (Rule 961(a), (b).)

Once appointed, State Bar Court judges are subject to discipline by this court on the same grounds as a judge of a court of record in this state. (§§ 6079.1, subd. (a), 6086.65, subd. (a); rule 961(d).) We have designated the Executive Director-Chief Counsel of the Commission on Judicial Performance to review and investigate complaints concerning the conduct of State Bar Court judges. (Rule 961(d).) If there is reasonable cause to institute formal proceedings, this court appoints active or retired judges of superior courts or Courts of Appeal as the court's special masters to hear the matter and report to this court their findings, conclusions, and recommendations regarding discipline. (*Ibid.*)

In 1995, this court appointed or reappointed a number of State Bar Court judges, including petitioners. Some judges were appointed for terms of less than six years in order to provide for staggered terms. In addition, in 1998 and 1999, we extended the terms of some judges who had been appointed previously. (See rule 961(c) [this court may extend the term of incumbent judges and provide for staggered terms].) Petitioner Obrien is the Presiding Judge of the State Bar Court, and was appointed by this court to a six-year term beginning November 1995. Petitioner Norian, the lay judge in the Review Department, was appointed in 1989 to a six-year term and reappointed in November 1995 to a three-year term. We subsequently extended Judge Norian's term, which currently expires on November 1, 2000. In 1995, we appointed petitioner Lonsdale to a three-year term as a judge in the Hearing Department, and subsequently extended that term to November 1, 2000. The terms of two other hearing judges and one other review judge, who are not parties to this proceeding, also expire on November 1, 2000.

Senate Bill No. 143 (1999-2000 Reg. Sess.) (hereafter referred to as Senate Bill 143) amended sections 6079.1 and 6086.65 to specify that those

Review Department shall be nominated, appointed, and subject to discipline as provided by subdivision (a) of Section 6079.1 . . . . [T]he Lay Judge . . . shall be a person who has never been a member of the State Bar or admitted to practice law before any court in the United States . . . ." (Stats. 1999, ch. 221, § 5.)

sections are repealed as of November 1, 2000, and that revised versions of those sections will be operative on the same date. (Stats. 1999, ch. 221, §§ 2, 3, 5, 6.) Revised section 6079.1, subdivision (a), provides that this court shall appoint the Presiding Judge of the State Bar Court and two of five hearing judges. Under the revised statute, the Governor, the Senate Committee on Rules, and the Speaker of the Assembly each appoints one of the three remaining hearing judges.[5] In addition, revised section 6086.65, subdivision (a), replaces the lay judge in the Review Department with a judge who is a member of the State Bar, although this court continues to appoint all three Review Department judges.[6]

Petitioners challenge the constitutionality of the foregoing revisions effected by Senate Bill 143.[7]

II

Petitioners contend that the Legislature's attempt to divest this court of the power to select and appoint all State Bar Court hearing judges, and its attempt to eliminate the lay judge position in the Review Department, violate the separation of powers doctrine. Emphasizing this court's inherent judicial authority over attorney discipline and our reliance upon the decisions and recommendations of the judges of the State Bar Court when we render disciplinary orders, petitioners assert that revised section 6079.1 exceeds the permissive level of legislative involvement in the attorney disciplinary process and defeats or materially impairs the exercise of our authority in this area. Petitioners further contend that the decision to eliminate the lay judge position in the Review Department, as specified in revised section 6086.65, is a public policy decision within the exclusive, inherent authority of this court, and not one that properly may be made by the

---

[5]Section 6079.1, subdivision (a), operative November 1, 2000, states in part: "The Supreme Court shall appoint a presiding judge of the State Bar Court. In addition, five hearing judges shall be appointed, two by the Supreme Court, one by the Governor, one by the Senate Committee on Rules, and one by the Speaker of the Assembly, to efficiently decide any and all regulatory matters pending before the Hearing Department of the State Bar Court. . . ." (Stats. 1999, ch. 221, § 3.)

[6]Section 6086.65, subdivision (a), operative November 1, 2000, states in part: "There is a Review Department of the State Bar Court, that consists of the Presiding Judge of the State Bar Court and two Review Department Judges appointed by the Supreme Court. The judges of the Review Department shall be nominated, appointed, and subject to discipline as provided by subdivision (a) of Section 6079.1 . . . ." (Stats. 1999, ch. 221, § 6.)

[7]Amicus curiae briefs in support of petitioners have been filed by the Center for Public Interest Law (represented by Robert C. Fellmeth, the State Bar discipline monitor from 1987 to 1992); by Attorneys Ephraim Margolin, Gerald Uelmen, and Jerome Fishkin; and by the law firm of Hansen, Boyd, Culhane & Watson, LLP, whose members include two former members of the State Bar's board of governors. Attorney Jerome Berg has filed a brief opposing the petition.

Legislature. Respondents, on the other hand, maintain that these revised statutes neither usurp nor infringe upon our inherent power, because the authority to dictate the composition and membership of the State Bar Court is a legislative function, and the changes made by the statutes do not alter the function of the disciplinary system. In evaluating the contentions of the parties, we shall consider our inherent authority over attorney admission and discipline, and the effect of the separation of powers doctrine upon legislative regulation in this area.

Article III, section 3 of the California Constitution states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

■ As we repeatedly have held, as the Legislature has recognized, and as respondents concede, the power to discipline licensed attorneys in this state is an expressly reserved, primary, and inherent power of this court. (*Rose, supra,* 22 Cal.4th at pp. 441-442; *Attorney Discipline, supra,* 19 Cal.4th at pp. 592-593, 601-603, and cases cited therein; § 6087.) Although the State Bar originally was created by the Legislature, the bar subsequently became—and remains—a constitutional entity within the judicial article of the California Constitution, and its assistance to this court in the disciplinary process is an integral part of the judicial function. (Cal. Const., art. VI, § 9; *Attorney Discipline, supra,* 19 Cal.4th at pp. 598-599.) "The State Bar Act did not delegate to the State Bar, the Legislature, the executive branch, or any other entity our inherent judicial authority over the discipline of attorneys." (*Attorney Discipline, supra,* 19 Cal.4th at p. 601.) We retain our preexisting powers to regulate and control the attorney admission and disciplinary system, including the State Bar Court, at every step. (*Id.* at pp. 606-607; *Brotsky v. State Bar* (1962) 57 Cal.2d 287, 300-301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310].)

The Legislature, however, does not necessarily violate the separation of powers doctrine whenever it legislates with regard to an inherent judicial power or function. (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 57 [51 Cal.Rptr.2d 837, 913 P.2d 1046].) " '[T]his court has respected the exercise by the Legislature, under the police power, of "a reasonable degree of regulation and control over the profession and practice of law . . ." in this state. [Citations.] This pragmatic approach is grounded in this court's recognition that the separation of powers principle does not command "a hermetic sealing off of the three branches of Government from one another." [Citation.]' (*Hustedt* v. *Workers' Comp. Appeals Bd.* [(1981)] 30 Cal.3d 329, 337-338 [178 Cal.Rptr. 801, 636 P.2d 1139], fn. omitted; see

also *Santa Clara County Counsel Attys. Assn.* v. *Woodside* [(1994)] 7 Cal.4th 525, 543 [28 Cal.Rptr.2d 617, 869 P.2d 1142] ['In the field of attorney-client conduct, we recognize that the judiciary and the Legislature are in some sense partners in regulation.'].)" (*Attorney Discipline, supra,* 19 Cal.4th at p. 602.)

"[O]ur traditional respect for legislative regulation of the practice of law, based upon principles of comity and pragmatism, is not to be viewed as an abdication of our inherent responsibility and authority over the core functions of admission and discipline of attorneys." (*Attorney Discipline, supra,* 19 Cal.4th at p. 603.) Thus, we have invalidated legislative enactments that materially impaired this inherent power, such as provisions authorizing another entity to discipline an attorney (*Hustedt v. Workers' Comp. Appeals Bd., supra,* 30 Cal.3d at pp. 339-341), permitting a corporation to appear in an action through an individual who is not an attorney (*Merco v. Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 727-733 [147 Cal.Rptr. 631, 581 P.2d 636]), and requiring the readmission of attorneys pardoned after disbarment for felony convictions (*In re Lavine* (1935) 2 Cal.2d 324, 329 [41 P.2d 161, 42 P.2d 311]). Moreover, any statute regarding the admission and discipline of attorneys is not exclusive, but is supplementary to, and in aid of, this court's inherent authority as the final policy maker in this area. (*Attorney Discipline, supra,* 19 Cal.4th at pp. 602-604, 607.)

The Legislature expressly has acknowledged that the disciplinary scheme and procedures set forth in the State Bar Act are not exclusive. "In their relation to the provisions of [the State Bar Act], concerning the disciplinary authority of the courts, the provisions of this article provide a complete alternative and cumulative method of hearing and determining accusations against members of the State Bar." (§ 6075; see also *Emslie v. State Bar* (1974) 11 Cal.3d 210, 224 [113 Cal.Rptr. 175, 520 P.2d 991].) Indeed, when the Legislature directed the board of governors to create a State Bar Court, it added the following language to section 6087: "Notwithstanding any other provision of law, the Supreme Court may by rule authorize the State Bar to take any action otherwise reserved to the Supreme Court in any matter arising under this chapter or initiated by the Supreme Court; provided, that any such action by the State Bar shall be reviewable by the Supreme Court pursuant to such rules as the Supreme Court may prescribe."

Accordingly, although in 1988 the Legislature directed the creation of the State Bar Court, and also provided for the appointment of State Bar Court judges, the decision to utilize and to rely upon the legislatively created disciplinary structure was reserved to this court. Furthermore, although we

have chosen to utilize the assistance of the State Bar Court in deciding admission and discipline matters, we also have prescribed procedures and criteria for the evaluation, selection, and appointment of State Bar Court judges, as well as procedural rules for the State Bar Court itself, that are separate from—and sometimes *different* from—those in the statutory provisions. (E.g., rules 951.5, 961; see also *Attorney Discipline, supra*, 19 Cal.4th 582 [this court unilaterally may impose fees upon attorneys to fund the legislatively created disciplinary system when the Legislature fails to assess sufficient State Bar dues for this purpose].)

Respondents therefore mischaracterize the State Bar Court to the extent they contend that, because it was legislatively created, it is not an arm of this court and its composition and administration are within the exclusive power of the Legislature. We recently rejected a very similar contention: "[T]he State Bar is not an entity created solely by the Legislature or within the Legislature's exclusive control, but rather is a constitutional entity subject to this court's expressly reserved, primary, inherent authority over admission and discipline. . . . Statutes [regarding the] disciplinary system are not exclusive—but are supplementary to, and in aid of, our inherent authority in this area." (*Attorney Discipline, supra*, 19 Cal.4th at p. 607.) We further rejected an assertion that this court may utilize the State Bar's existing disciplinary structure only if we acquiesce in all legislative determinations regarding the discipline system. (*Id.* at pp. 597-607.) Accordingly, contrary to the position of respondents, the Legislature does not possess the ultimate authority with regard to the structure or operations of the State Bar Court. Rather, this court retains the ultimate authority to determine and approve the composition, procedures, and functions of the State Bar Court.

In light of the foregoing well-established principles, this court's primary, inherent power over attorney admission and discipline undoubtedly encompasses the authority to appoint the State Bar Court judges who assist this court in exercising this power. As established above, however, the circumstance that the power to appoint State Bar Court judges is an aspect of the judicial power over the practice of law does not end our inquiry. The question is whether a legislative provision permitting the executive and legislative branches to appoint three of the five hearing judges in the State Bar Court, as specified in revised section 6079.1, subdivision (a), necessarily results in a material impairment of this court's inherent power over admission and discipline. As we shall explain, in light of the numerous significant safeguards and checks described below, we conclude that it does not.

Petitioners maintain that our inherent authority over the admission and discipline of attorneys includes the *exclusive* power to appoint State Bar

Court judges. According to petitioners, we can repose confidence in the findings and recommendations of these judges only if they possess the qualifications and attributes that this court deems important and desirable. In evaluating petitioners' contention, we first consider the necessary qualifications for State Bar Court judges established by statute and by this court's rules.

The existing and the revised versions of section 6079.1 set forth the same qualifications for State Bar Court hearing judges. Thus, in both versions of the statute, section 6079.1, subdivision (b), specifies that each hearing judge must have been a member of the State Bar for at least five years, must not have any record of discipline as an attorney, and must meet other requirements as established by Government Code section 12011.5, subdivision (d). This Government Code provision, which concerns the evaluation by the State Bar of candidates for judicial office in courts of record, states: "In determining the qualifications of a candidate for judicial office, the State Bar shall consider, among other appropriate factors, his or her industry, judicial temperament, honesty, objectivity, community respect, integrity, health, ability, and legal experience." These factors track those that this court has directed the Applicant Evaluation and Nomination Committee to consider in evaluating candidates for State Bar Court judge. Rule 961(b)(2), promulgated by this court, states in part: "In determining the qualifications of an applicant for appointment or reappointment the committee shall consider, among other appropriate factors, the following: industry, legal and judicial experience (including prior service as a judge of the State Bar Court), judicial temperament, honesty, objectivity, community respect, integrity, and ability." In addition, rule 961(b)(2) specifies that the committee's recommendations for appointment "shall be made in conformity with" section 6079.1, subdivision (b).

Thus, seven of the enumerated factors in the statute and the rule are identical, the eighth is almost identical ("legal experience" versus "legal and judicial experience (including prior service as a judge of the State Bar Court)"), and the statutory provision includes an additional factor (health) that is not included in rule 961. Accordingly, section 6079.1, subdivision (b), requires that the Governor, the Senate Committee on Rules, and the Speaker of the Assembly each shall consider applicant qualifications and attributes that are virtually identical to, and equally important as, those specified by this court.

Nevertheless, petitioners suggest that the Governor, the Senate Committee on Rules, and the Speaker of the Assembly might place importance upon different qualifications and characteristics, thus abrogating the appointment

mechanism created by this court pursuant to rule 961 and undermining our ability to rely upon the decisions of their appointees. Although the various appointing authorities might evaluate and balance these factors in a different manner, we find that this circumstance would not necessarily result in the appointment of unqualified hearing judges or preclude this court from relying upon the decisions and recommendations of hearing judges whom we do not appoint. Contrary to the assertion of petitioners, the absence of a statutory provision expressly conferring authority upon this court to ensure the appointment of qualified hearing judges does not preclude us from exercising such authority pursuant to our inherent powers and rule 961.

Despite the existence or nonexistence of statutes governing particular subjects or procedures regarding attorney admission and discipline, this court retains ultimate control over all the admission and disciplinary functions of the State Bar Court. For example, we previously decreased the number of hearing judges from seven to five, contrary to the express mandate in section 6079.1, subdivision (a), that this court shall appoint no fewer than seven hearing judges. In addition, it is well established that in this arena we possess the authority to require more protection of the public and the profession than the Legislature has specified. (*Attorney Discipline, supra*, 19 Cal.4th at p. 602.) One instance of the exercise of such authority is this court's adoption of rule 961 as an alternative to section 6079.1, subdivision (c), which, both before and after passage of Senate Bill 143, provides that the State Bar Board of Governors shall screen and rate all applicants for appointment or reappointment as a State Bar Court judge, unless otherwise directed by the appointing authority. In 1995, after several years of experience with the operations of the State Bar Court, we determined that, because the bar's board of governors also oversees the prosecutorial arm of the State Bar (the Office of Trial Counsel, which is a party in all proceedings before the State Bar Court), it would be more appropriate for this court, before appointing or reappointing individuals to positions as State Bar Court judges, to rely instead upon an independent entity, appointed by this court, to rate applicants and to make recommendations regarding the appointment of individuals engaged in the adjudicatory function of the disciplinary system. Thus, we promulgated a rule providing for the creation of the seven-member Applicant Evaluation and Nomination Committee, appointed by this court, which consists of four members of the State Bar in good standing, two retired or active judicial officers, and one public member. Two of these seven members must be present members of the State Bar's board of governors, but neither of these two individuals may be members of the board's discipline committee. (Rule 961(a)(1).)

Although section 6079.1, subdivision (c), as amended by Senate Bill 143, provides that the board of governors shall screen and rate all applicants and

"submit its recommendations to the appointing authority, unless otherwise directed by the appointing authority," in order to ensure the appointment of qualified judges in whom the public, the legal profession, and the judiciary may repose confidence, this court, consistent with its prior practice, shall continue to direct *all* applicants seeking appointment as a State Bar Court judge to be screened and evaluated by the Applicant Evaluation and Nomination Committee pursuant to rule 961 and in light of the factors specified in section 6079.1, subdivision (b), and Government Code section 12011.5, subdivision (d). The committee shall report in confidence its evaluations and ratings of each applicant to the respective appointing authority as well as to this court, and only those applicants shall be appointed whom the committee (or this court, upon a request for reconsideration by the appointing authority) finds qualified, in light of all of the relevant factors, to perform the duties of a State Bar Court judge. Thus, the court can ensure that any particular applicant appointed by the executive or legislative branch has been evaluated objectively by an independent and neutral entity appointed by this court, and possesses the statutory qualifications and attributes, as well as the qualifications required by this court, that are necessary to serve as a State Bar Court judge. In this manner, we may continue to have confidence in and to rely upon the decisions of these judges.

Petitioners contend that several California decisions support the position that only a court may appoint commissioners, magistrates, special masters, referees, or other assistants upon whom the court relies in exercising judicial functions. (*Millholen v. Riley* (1930) 211 Cal. 29 [293 P. 69] [affirming the power of a court to appoint its employees and fix their salaries, in the absence of legislation on the subject]; *People v. Hayne* (1890) 83 Cal. 111 [23 P. 1] [upholding legislation conferring upon this court the authority and funds to appoint commissioners]; *Tuolumne County v. Stanislaus County* (1856) 6 Cal. 440 [holding that the appointment of commissioners is a judicial function];[8] see also *State v. Noble* (1889) 118 Ind. 350 [21 N.E. 244, 245-249] [concluding that the court's judicial power to appoint its assistants is exclusive, and that no other branch may exercise that authority without violating the separation of powers doctrine]; *In re Supreme Court Commission* (1916) 100 Neb. 426 [160 N.W. 737, 738] ["Neither the Legislature nor the Governor has the right to dictate whom the court shall appoint as its referees or assistants."].) State Bar Court judges, petitioners assert, act in a capacity similar to that of a special master or referee, and their appointment also should be an exclusively judicial function.

---

[8]We subsequently overruled *Tuolumne County v. Stanislaus County, supra*, 6 Cal. 440, to the extent it concluded that the appointment of the particular commissioners in that case—whose sole duty as prescribed by the Legislature was to apportion debt between two counties—was a judicial function. (*People v. Provines* (1868) 34 Cal. 520, 531.)

We agree with petitioners that the cited decisions embody principles that are fundamental to the separation of powers doctrine. Nonetheless, although a State Bar Court hearing judge may in some respects occupy a position analogous to that of a special master or referee, we believe that these decisions are distinguishable from this case on at least three grounds. First, none of the decisions involved the appointment of assistants who operate only within a discrete arena, like the attorney discipline system, in which a significant degree of legislative regulation has been found permissible.[9] As we have explained, California's unique system for the admission and discipline of attorneys is in some sense a cooperative endeavor between the judiciary and the Legislature, and this court often has upheld legislative measures touching upon this arena, invalidating laws only on the rare occasions when it is determined that they materially impaired our inherent power over attorney admission and discipline. (*Attorney Discipline, supra,* 19 Cal.4th at pp. 602-603.)

Second, the decisions upon which petitioners rely did not consider whether the executive or legislative branch may appoint judicial assistants only after they have been found to be qualified by an independent entity whose members are appointed by the judiciary. As explained above, consistent with the procedure that this court has utilized in the past for its appointments to the State Bar Court, all applicants who seek appointment as a State Bar Court judge must be screened and evaluated by the Applicant Evaluation and Nomination Committee in light of the qualifications specified by statute and by rule of court.

Third, even within the limited realm of attorney admission and discipline, the State Bar Court hearing judges are distinguishable from the judicial assistants considered in the prior cases, because unlike special masters or referees who render findings and recommendations directly to the court, with no opportunity for an intermediate level of review or evaluation, the findings and recommendations of State Bar Court hearing judges are reviewable by this court's appointees in the Review Department at the request of the disciplined attorney or the State Bar. (Rules Proc. of State Bar, rule 301.)

As noted above, the Review Department independently reviews the record and may adopt findings, conclusions, and a decision or recommendation at variance with those of the hearing judge. (Rule 951.5; Rules Proc. of State Bar, rule 305(a).) Although in 1999 the Legislature specified a more deferential standard of review governing Review Department consideration of Hearing Department decisions (§ 6086.65, subd. (d)), we subsequently

---

[9]As respondents observe, before the creation of the State Bar Court the Legislature had specified that some members of the bar's disciplinary boards were to be appointed by the Governor. (See, e.g., Stats. 1975, ch. 874, § 9, p. 1954.)

reinstated the traditional independent standard of review when we adopted rule 951.5. The Review Department also may remand the proceeding to the Hearing Department for a new trial on specified issues or a trial de novo. (Rules Proc. of State Bar, rule 305(a).) Although the original proceeding and the proceeding on remand ordinarily are held before the same hearing judge, the Review Department may order otherwise. (*Ibid.*) The Review Department must accord great weight to the hearing judge's findings of fact resolving issues involving the credibility of witnesses, but it is not bound by such findings. (*Ibid.*) Furthermore, as an alternative to remanding the proceeding to the Hearing Department, the Review Department may appoint a hearing judge as a referee to receive evidence and make proposed additional findings of fact. (*Id.,* rule 306(d).) Finally, even after a State Bar Court decision is transmitted to this court, we "may remand the matter to the State Bar Court with instructions to conduct such further proceedings as [we] deem[] necessary." (Rule 953.5.)

In light of the requirement that an applicant must be found qualified by the Applicant Evaluation and Nomination Committee or by this court before he or she may be appointed as a State Bar Court hearing judge, and the broad authority of the Review Department (all of whose members we appoint) to evaluate and to accept or reject independently the findings and recommendations of hearing judges, to order additional evidentiary proceedings, and to render the State Bar Court's ultimate findings and recommendations that are presented for this court's consideration, we presently discern no reason why we may not continue to repose confidence in and to rely upon a State Bar Court in which some hearing judges are appointed by the executive and legislative branches pursuant to section 6079.1. Despite the circumstance that such appointees are subject to reappointment by the same nonjudicial appointing authorities, our reserved power over the appointment (and reappointment) process and the structural and procedural safeguards in both that process and the disciplinary system guard against any risk or perception that the process may become politicized, as predicted by petitioners and amicus curiae Center for Public Interest Law. As in the past, all hearing judges shall be subject to the primary authority and supervision of this court. (See *People ex rel. Lowe v. Marquette Nat. Fire Ins. Co.* (1933) 351 Ill. 516 [184 N.E. 800, 805-806] [the legislature's designation of an officer of the executive branch to function as a judicial receiver in specified proceedings grants the officer no powers independent of the court, because his or her acts and reports are subject to the approval of the court].)[10]

Thus, unlike other instances of legislative regulation of the practice of law that we have found would materially impair our inherent authority in this

---

[10]Other decisions have limited the power of the Legislature to interfere with the judicial branch's ultimate authority over its judicial assistants, but these decisions also are distinguishable from the present matter.

area, revised section 6079.1, subdivision (a), does not undermine our ultimate regulatory power over attorney admission and discipline. Therefore, permitting the Governor, the Senate Committee on Rules, and the Speaker of the Assembly each to appoint one hearing judge found to be qualified by the Applicant Evaluation and Nomination Committee (or by this court upon reconsideration) does not necessarily defeat or materially impair our inherent authority over the practice of law.

We reach the same conclusion with regard to the elimination of the lay judge position in the Review Department, as provided in revised section 6086.65, subdivision (a). In challenging this provision, petitioners refer to a number of public policy considerations supporting public participation in the attorney disciplinary process, such as promoting public confidence and broadening the perspective of the State Bar Court. Although we recognize that these are legitimate considerations, we conclude that our inherent authority over attorney discipline is not defeated or materially impaired by a requirement that all judges in the Review Department (who continue to be appointed by this court) should be lawyers. (Cf. *Gordon v. Justice Court* (1974) 12 Cal.3d 323, 328-332 [115 Cal.Rptr. 632, 525 P.2d 72, 71 A.L.R.3d 551] [discussing disadvantages of permitting a nonattorney to act as a justice court judge in a criminal proceeding].) In this regard, we note that at least some of the benefits of a more diverse perspective formerly provided by the lay review judge may be achieved through nonjudicial appointment of some hearing judges. The circumstance that this revision emanated from the Legislature does not, in itself, render the measure violative of the separation of powers doctrine. (See *Warden v. State Bar* (1999) 21 Cal.4th 628, 643-644, fn. 9 [88 Cal.Rptr.2d 283, 982 P.2d 154] [noting

For example, *In re Edgar M.* (1975) 14 Cal.3d 727, 736 [122 Cal.Rptr. 574, 537 P.2d 406], held that the findings and order of a juvenile court referee cannot become final by operation of law when the court fails to act upon an application for rehearing within the time specified by statute. Our decision states that allowing such a result would violate the restriction of the referee's powers to *subordinate* judicial duties (Cal. Const., art. VI, § 22), because the referee's decision automatically would become that of the court. In contrast, a recommendation of a State Bar Court judge cannot become final until this court enters an order adopting the recommendation, and we very recently upheld the constitutionality of this scheme for judicial review of State Bar Court decisions. (*Rose, supra,* 22 Cal.4th 430.)

In *People v. Superior Court (Mudge)* (1997) 54 Cal.App.4th 407, 411-413 [62 Cal.Rptr.2d 721], the Court of Appeal held unconstitutional a statute providing that a retired judge assigned by the Chief Justice to hear an action cannot preside if the parties stipulate that the retired judge is unqualified. The court determined that this statute defeated or substantially impaired the Chief Justice's express authority to assign such judges under a separate and distinct constitutional provision (Cal. Const., art. VI, § 6). In the present case, however, *this court* has decided that, *as a general matter*, its inherent constitutional power to appoint State Bar Court judges is not defeated or materially impaired by permitting other branches to exercise an appointment authority pursuant to the procedures the court has prescribed. No other entity or party is exercising a unilateral power to defeat a previously asserted judicial power in a particular proceeding.

adoption by this court of exemptions to mandatory continuing legal education program requirements consistent with the legislative policy judgments embodied in § 6070].)

In sum, our inherent, primary authority over the practice of law extends to determining the composition of the State Bar Court and appointing State Bar Court judges. Nevertheless, this authority is not defeated or materially impaired by the replacement of the lay judge in the Review Department with an attorney review judge or by the appointment of three of the five Hearing Department judges by the executive and legislative branches, pursuant to the safeguards and procedures previously utilized by this court to ensure that State Bar Court appointees are qualified to perform the duties of review or hearing judges. Therefore, these provisions in revised sections 6079.1 and 6086.65 do not violate the separation of powers doctrine.

## III

Revised section 6079.1, subdivision (a), provides that two hearing judges shall be appointed by this court and that three hearing judges shall be appointed respectively by the Governor, the Senate Committee on Rules, and the Speaker of the Assembly. The statute, however, does not specify the order in which these appointing authorities will fill vacancies on the State Bar Court, or in which location their appointees will serve. Therefore, pursuant to our inherent authority and rule 961(c), we shall issue an order, included as an appendix to this opinion, specifying procedures for the appointment of State Bar Court judges under the new law.

The Hearing Department presently conducts proceedings at two locations—Los Angeles and San Francisco. The State Bar's Rules of Procedure govern the venue in which proceedings shall occur, and specify that the presiding judge shall provide for the overall supervision of calendar management and assignment of judges. (Rules Proc. of State Bar, rules 52-54, 1013.) Thus, the presiding judge determines how many judges sit in each venue. Presently three hearing judges sit in Los Angeles and two sit in San Francisco, and this division of resources roughly approximates the allocation of cases between the two venues.

The terms of two Los Angeles hearing judges and one San Francisco hearing judge expire on November 1, 2000. Because the two hearing judges whose terms do not expire this year were appointed by this court, we shall permit the Governor, the Senate Committee on Rules, and the Speaker of the Assembly each to fill one of the three vacancies occurring on November 1, 2000. The Governor and the Speaker of the Assembly each shall appoint a judge to serve in Los Angeles, and the Senate Committee on Rules shall appoint a judge to serve in San Francisco. This court retains the authority to

designate appointments in different locations and to direct that previously appointed judges serve in other venues as administrative needs or other circumstances change.

We also shall provide for newly staggered terms for all State Bar Court judges. Presently the terms of current judges all expire in November 2000 or November 2001. In order to provide for the orderly recruitment, evaluation, and appointment of an approximately equal number of judges every two years, the appointees of the Governor, the Senate Committee on Rules, and the Speaker of the Assembly each shall serve initial terms of six, four, and two years, respectively, subject to reappointment by the same appointing authority for a full six-year term. The terms of the judges whom we shall appoint in November 2000 and November 2001 similarly shall be staggered, as specified in the appended order.

Our order also shall amend rule 961 as necessary to implement the revised statutory scheme. As explained above, rule 961(a) presently provides that this court appoints an Applicant Evaluation and Nomination Committee to solicit, receive, screen, and evaluate applications for appointment and/or reappointment to any appointive position of judge of the State Bar Court. The committee adopts and implements procedures for the notice of anticipated vacancies, receipt and evaluation of applications, and transmittal of its recommendations to this court. As specified in the amended rule, and consistent with our previous practice pursuant to rule 961, we shall continue to require all applicants for positions as a State Bar Court judge to submit applications to this court's Applicant Evaluation and Nomination Committee and to follow the procedures adopted by that committee. So that this court may ensure that all appointees are qualified to perform the duties of a State Bar Court judge, the committee shall submit in confidence its ratings and evaluations of all applicants for nonjudicial appointments, including the candidate's application, to this court as well as to the nonjudicial appointing authority. Only applicants found to be qualified by the committee, or by this court upon a request for reconsideration by the appointing authority, are eligible to be appointed to a position as a State Bar Court judge.

IV

The petition is denied and the order to show cause is discharged. Each party shall bear his or her own costs.

Mosk, J., Baxter, J., and Chin, J., concurred.

APPENDIX

The court anticipates that, unless otherwise specified, the following order will be issued and become effective immediately upon the finality of the accompanying opinion.

ORDER

Amendments to rule 961 of the California Rules of Court, regarding State Bar Court judges, as set forth in the attachment hereto, are hereby adopted. The amendments to rule 961 shall become effective July 1, 2000.

Business and Professions Code section 6079.1, subdivision (a), operative November 1, 2000, provides that this court shall appoint two State Bar Court hearing judges, and that the Governor, the Senate Committee on Rules, and the Speaker of the Assembly each shall appoint one hearing judge. Presently three hearing judges sit in Los Angeles and two sit in San Francisco. The terms of two Los Angeles hearing judges and one San Francisco hearing judge expire on November 1, 2000. No statute or other provision specifies which appointing authorities shall appoint judges for these positions.

Therefore, pursuant to this court's inherent authority over the admission and discipline of attorneys, and rule 961(c) of the California Rules of Court, we hereby implement Business and Professions Code section 6079.1, subdivision (a), as follows.

The appointments for the positions of the three hearing judges whose terms expire on November 1, 2000, shall be made by the Governor, the Senate Committee on Rules, and the Speaker of the Assembly. The appointees of the Governor and the Speaker of the Assembly shall serve in Los Angeles, and the appointee of the Senate Committee on Rules shall serve in San Francisco. In order to obtain the significant benefits of staggered terms, the appointees of the Governor, the Senate Committee on Rules, and the Speaker of the Assembly shall be appointed to initial terms of six, four, and two years, respectively. Upon the expiration of these terms, appointees or reappointees to these positions shall be appointed by the respective appointing authority to full six-year terms.

The terms of the Supreme Court appointees to the State Bar Court similarly shall be staggered. The current term of the Presiding Judge of the State Bar Court expires on November 1, 2001, and the Supreme Court's next appointee or reappointee to that position shall serve an initial term of five years, expiring on November 1, 2006. The current terms of the two other

Review Department judges expire on November 1, 2000. The court's next appointee or reappointee to the position that is now held by an attorney review judge shall serve an initial term of four years, expiring on November 1, 2004. The court's appointee to the position that is now held by the lay review judge shall serve an initial term of two years, expiring on November 1, 2002. The current terms of the two hearing judges whose positions will be filled by the Supreme Court expire on November 1, 2001. The court's next appointee or reappointee to the hearing judge position in San Francisco shall serve an initial term of five years, expiring on November 1, 2006. The court's next appointee or reappointee to the hearing judge position in Los Angeles shall serve an initial term of three years, expiring on November 1, 2004. Upon the expiration of these terms, Supreme Court appointees or reappointees to all of these positions shall be appointed by the Supreme Court to full six-year terms.

All applicants for any appointive position as a State Bar Court judge shall submit an application to the Applicant Evaluation and Nomination Committee created pursuant to rule 961, and the committee shall screen, evaluate, and rate all such applicants after considering the factors set forth in Business and Professions Code section 6079.1, subdivision (b), Government Code section 12011.5, subdivision (d), and rule 961(b)(3). The committee shall notify potential applicants of vacancies occurring on November 1, 2000, no later than July 15, 2000. The committee shall submit the materials specified in rule 961(b) to this court and, as applicable, to nonjudicial appointing authorities no later than October 1, 2000. In the event the Governor, the Senate Committee on Rules, or the Speaker of the Assembly wishes to seek reconsideration of a finding by the committee that a particular applicant is unqualified, a request for reconsideration may be filed with this court no later than October 6, 2000. Only applicants found qualified by the committee or by this court, in light of the factors specified in the provisions referred to above, may be appointed to a position as a State Bar Court judge.

## RULE 961.   STATE BAR COURT JUDGES

### (a)   [Applicant Evaluation and Nomination Committee]

(1)   The Supreme Court shall create an Applicant Evaluation and Nomination Committee (committee) to solicit, receive, screen and evaluate <u>all</u> applications for appointment and/or reappointment to any appointive position of judge of the State Bar Court (hearing judge, presiding judge, <u>and</u> review department judge, and lay judge of the Review Department). The committee, which shall serve at the pleasure of the Supreme Court, shall consist of seven members appointed by the court of whom four shall be

members of the State Bar in good standing, two shall be retired or active judicial officers, and one shall be a public member who has never been a member of the State Bar or admitted to practice before any court in the United States. Two members of the committee shall be present members of the Board of Governors of the State Bar (neither of whom shall be from the Board's Discipline Committee).

(2) The committee shall adopt, and implement upon approval by the Supreme Court, procedures for: (a) timely notice to potential applicants of vacancies, which, in the case of anticipated vacancies, shall mean notice shall be given no less than nine months before the expiration of the term; (b) receipt of applications for appointments to those positions from both incumbents and other qualified persons; (c) soliciting and receiving public comment; (d) evaluation and rating of applicants,; and (e) transmittal of its recommendations the materials specified in rule 961(b) to the Supreme Court and, as applicable, other appointing authorities. The procedures adopted by the committee shall include provisions to ensure confidentiality comparable to those followed by the commission established pursuant to Government Code section 12011.5 [Judicial Nominees Evaluation Commission].

(3) The Board of Governors of the State Bar, in consultation with the Supreme Court if necessary, shall provide facilities and support staff needed by the committee to carry out its obligations under this rule.

**(b) [Evaluations and recommendations]**

(1) With regard to applicants seeking positions appointed by the Supreme Court, Tthe committee shall evaluate the qualifications of and rate all applicants and shall submit to the Supreme Court the nominations of at least three qualified candidates for each vacancy. The committee shall report in confidence to the Supreme Court its evaluation and rating of applicants recommended for appointment, and the reasons therefor, including a succinct summary of their qualifications, at a time to be designated by the Supreme Court. The report shall include written comment received by the committee, which shall be transmitted to the Supreme Court together with the nominations.

(2) With regard to applicants seeking positions appointed by the Governor, the Senate Committee on Rules, or the Speaker of the Assembly, the committee shall evaluate the qualifications of and rate all applicants and shall submit in confidence to the Supreme Court and, as applicable, to other appointing authorities all applications for such positions together with the

committee's evaluation and rating of these applicants, including any written comments received by the committee, at a time to be designated by the Supreme Court.

(3)   In determining the qualifications of an applicant for appointment or reappointment the committee shall consider, among other appropriate factors, the following: industry, legal and judicial experience (including prior service as a judge of the State Bar Court), judicial temperament, honesty, objectivity, community respect, integrity, and ability. Any evaluation or rating of an applicant and ~~Aa~~ny recommendation for appointment or reappointment by the committee shall be made in conformity with subdivision (b) of Business and Professions Code section 6079.1 and in light of the factors specified in Government Code section 12011.5, subdivision (d), and those specified in this subdivision.

~~(3)   The committee shall report in confidence to the Supreme Court its evaluation and rating of applicants recommended for appointment, and the reasons therefor, including a succinct summary of their qualifications, at least one hundred twenty days before a vacancy occurring on the expiration of an incumbent judge's term, or, in the case of an unanticipated vacancy, within ninety days after receipt of the last timely application. The report shall include written comment received by the committee which shall be transmitted to the Supreme Court, together with the nominations.~~

(4)   Upon transmittal of its report to the Supreme Court, the committee shall notify any incumbent who has applied for reappointment by the Supreme Court if he or she is or is not among the applicants recommended for appointment to the new term by the committee. The ~~Supreme Court~~ applicable appointing authority shall notify as soon as possible an incumbent who has applied for reappointment but is not selected ~~as soon as possible~~.

(c)   **[Appointments]**   Only applicants found to be qualified by the committee or by the Supreme Court may be appointed. Upon the request of the Governor, the Senate Committee on Rules, or the Speaker of the Assembly, the Supreme Court will reconsider a finding by the committee that a particular applicant is not qualified. The Supreme Court shall make such orders as to the appointment of applicants as it deems appropriate, including extending the term of incumbent judges pending such order or providing for staggered terms.

(d)   **[Discipline for misconduct or disability]**   A judge of the State Bar Court is subject to discipline or retirement on the same grounds as a judge of a court of this state. Complaints concerning the conduct of a judge of the

State Bar Court shall be addressed to the Executive Director-Chief Counsel of the Commission on Judicial Performance, who is hereby designated as the Supreme Court's investigator for the purpose of evaluating those complaints, conducting any necessary further investigation, and determining whether formal proceedings should be instituted. If there is reasonable cause to institute formal proceedings, the investigator shall notify the Supreme Court of that fact and shall serve as or appoint the examiner and make other appointments and arrangements necessary for the hearing. The Supreme Court shall then appoint one or more active or retired judges of superior courts or Courts of Appeal as its special masters to hear the complaint and the results of the investigation, and to report to the Supreme Court on the masters' findings, conclusions, and recommendations as to discipline. The procedures of the Commission on Judicial Performance shall be followed by the investigator and special masters, to the extent feasible. Procedure in the Supreme Court after a discipline recommendation is filed shall, to the extent feasible, be the same as is followed when a ~~recommendation~~ determination of the Commission on Judicial Performance is filed.

**KENNARD, J.**—I dissent.

The majority holds that the state Constitution's separation of powers clause permits officers of the legislative and executive branches to appoint and reappoint judges of the State Bar Court and to alter that court's composition by eliminating public (that is, nonattorney) representation. I disagree. Because the State Bar Court operates as an arm of this court in hearing attorney discipline matters, and because this court has primary authority over attorney discipline, judges of the State Bar Court are subordinate judicial officers that must be answerable only to this court. Because the law at issue makes State Bar Court judges subservient to members of the political branches, and because it alters the composition of the State Bar Court in a way likely to reduce public confidence in the attorney discipline system, the law is invalid under the separation of powers clause of the California Constitution.

I

Article VI of the California Constitution vests the judicial power of this state "in the Supreme Court, courts of appeal, superior courts, and municipal courts, all of which are courts of record." (Cal. Const., art. VI, § 1.) "In

California, the power to regulate the practice of law, including the power to admit and to discipline attorneys, has long been recognized to be among the inherent powers of the article VI courts. Indeed every state in the United States recognizes that the power to admit and to discipline attorneys rests in the judiciary." (*Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 336-337 [178 Cal.Rptr. 801, 636 P.2d 1139], fn. omitted.) In exercising its power over attorney discipline, this court has long relied on the State Bar, a public corporation constitutionally recognized as integral to the operations of the judicial branch. (*In re Rose* (2000) 22 Cal.4th 430, 438 [93 Cal.Rptr. 298, 993 P.2d 956].)

Before 1988, the State Bar's disciplinary system was staffed by volunteer attorneys serving as referees, who conducted hearings and made recommendations to the bar's board of governors, which in turn made recommendations to this court for the disciplining of attorneys. (*In re Rose, supra,* 22 Cal.4th 430, 438.) Since 1988, the State Bar Court has assumed this role. (*Ibid.*) Because it assists in the discharge of this court's duty to discipline attorneys, the State Bar Court operates as an administrative arm of this court. (*Id.* at p. 439.) The State Bar Court is staffed by salaried judges who, until now, have all been appointed by this court. (Cal. Rules of Court, rule 961(c).) They are subject to removal by this court only on grounds that would justify removal of a judge of this state. (*Id.,* rule 961(d).)

The State Bar Court is divided into the Hearing Department and the Review Department. The Hearing Department is the trial department of the State Bar Court (Rules Proc. of State Bar, rule 2, definition 2.60); in attorney discipline proceedings, the trial is an evidentiary hearing on the merits conducted before a hearing judge (*id.,* rule 2, definition 3.16). At the conclusion of the hearing, the hearing judge renders a written decision recommending the discipline, if any, to be imposed. (*Id.,* rule 220.) The Review Department is the appellate department of the State Bar Court (*id.,* rule 2, definition 3.02), in which the rulings and orders of a hearing judge are reviewed (*id.,* rule 300 et seq.). After it becomes final, a State Bar Court decision recommending that an attorney be suspended or disbarred is transmitted to this court. (*Id.,* rule 250.) The State Bar Court's discipline recommendations are advisory and may be implemented only by order of this court after independent review on the merits. (*In re Rose, supra,* 22 Cal.4th 430, 441-448.)

The State Bar Court is now staffed by five hearing judges and three judges of the Review Department, all of whom serve six-year terms. (Bus. & Prof. Code, §§ 6079.1, 6086.65; see maj. opn., *ante,* at p. 45.) One of the judges of the Review Department is a "lay judge," meaning a person who is not and has never been licensed to practice law. (Maj. opn., *ante,* at p. 45, fn. 4.)

By Senate Bill No. 143 (1999-2000 Reg. Sess.), the Legislature has recently amended Business and Professions Code section 6079.1 to provide for appointment of three of the five hearing judges by persons other than this court. This law, the validity of which is here challenged, grants the Governor, the Senate Committee on Rules (chaired by the Senate President Pro Tempore), and the Speaker of the Assembly authority to each appoint one hearing judge. The same bill also amended Business and Professions Code section 6086.65 to replace the lay judge in the Review Department with a judge who is a member of the State Bar.

## II

The California Constitution expressly provides for the separation of governmental powers among the three branches of state government: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) Although this particular provision dates only from 1972, our state Constitution "[f]rom its inception . . . has contained an explicit provision embodying the separation of powers doctrine." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52 [51 Cal.Rptr.2d 837, 913 P.2d 1046].)

The doctrine of separation of powers long predates our state Constitution; its origins "can be traced to the fourth century B.C. when Aristotle, in his treatise entitled *Politics*, described three agencies of government: the general assembly, the public officials, and the judiciary." (Ervin, *Separation of Powers: Judicial Independence* (1970) 35 Law & Contemp. Probs. 108, fn. omitted.) The "leading Framers" of the federal Constitution "viewed the principle of separation of powers as the central guarantee of a just government." (*Freytag v. Commissioner* (1991) 501 U.S. 868, 870 [111 S.Ct. 2631, 2364, 115 L.Ed.2d 764].) Referring to the separation of powers doctrine, James Madison said: "No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty . . . ." (Madison, The Federalist No. 47 (Rossiter edit. 1961) p. 301.)

The purpose of separation of powers is to protect individual liberty by preventing concentration of powers in the hands of any one individual or body. (*Buckley v. Valeo* (1976) 424 U.S. 1, 122 [96 S.Ct. 612, 683-684, 46 L.Ed.2d 659].) Among the three great departments or branches into which the state and the federal governments are divided—the legislative, executive, and judicial branches—the framers of the federal Constitution were most apprehensive about the legislative branch. (*Buckley v. Valeo, supra,* at p. 129 [96 S.Ct. at p. 687] ["the debates of the Constitutional Convention, and the

Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches"].) At the Philadelphia convention, James Madison explained it this way: " '[E]xperience in all states has evinced a powerful tendency in the legislature to absorb all power into its vortex. This was the real source of danger to the American [state] Constitutions; and suggested the necessity of giving every defensive authority to the other departments that was consistent with republican principles.' " (Ervin, *Separation of Powers: Judicial Independence, supra,* 35 Law & Contemp. Probs. 108, 113.)

Because the manipulation of official appointments "was deemed 'the most insidious and powerful weapon of eighteenth century despotism' " (*Freytag v. Commissioner, supra,* 501 U.S. 868, 883 [111 S.Ct. 2631, 2641]), the framers of the federal Constitution very carefully and deliberately embedded the separation of powers concept in that Constitution's appointments clause (*Freytag v. Commissioner, supra,* at p. 882 [111 S.Ct. at pp. 2640-2641]). Under that clause (U.S. Const., art. II, § 2, cl. 2), Congress retains authority "to appoint its own officers to perform functions necessary to that body as an institution." (*Buckley v. Valeo, supra,* 424 U.S. 1, 127 [96 S.Ct. 612, 686].) But Congress is denied authority to appoint any officers of the judicial or executive branches. (*Id.* at p. 129 [96 S.Ct. at p. 687].) For higher ranking officers, such as cabinet-level department heads, ambassadors, and justices of the United States Supreme Court, the appointments clause provides that the President is to nominate and appoint the officer, "by and with the advice and consent of the Senate." For all other judicial and executive branch officers, Congress has discretion to select the appointing authority, but its choice is confined to only three possible designees, a limitation that "reflects our Framers' conclusion that widely distributed appointment power subverts democratic government." (*Freytag v. Commissioner, supra,* at p. 885 [111 S.Ct. at p. 2642].) Congress may vest authority to appoint officers of lesser rank "in the President alone, in the courts of law, or in the heads of departments." (U.S. Const., art. II, § 2, cl. 2.) Thus, Congress is not permitted to designate itself or any of its officers as the appointing authority for lower ranking officers of the executive and judicial branches of government. (*Buckley v. Valeo, supra,* at p. 129 [96 S.Ct. at p. 687].) Nor may Congress retain for itself a power, apart from impeachment, to remove an officer who exercises executive or judicial authority. (*Bowsher v. Synar* (1986) 478 U.S. 714, 732 [106 S.Ct. 3181, 3190-3191, 92 L.Ed.2d 583].)

The decision to deny Congress authority to control the appointment or removal of lower ranking executive and judicial officers was deliberate. As James Madison said in the First Congress: " 'The Legislature creates the office, defines the powers, limits its duration and annexes a compensation.

This done, the Legislative power ceases. They ought to have nothing to do with designating the man to fill the office.' " (*Myers v. United States* (1926) 272 U.S. 52, 128 [47 S.Ct. 21, 29, 71 L.Ed. 160], quoting 1 Annals of Cong. (1789) 581, 582.)

When construing the appointments clause of the federal Constitution, the United States Supreme Court has recognized that it is "usual and proper to vest the appointment of inferior officers in that department of the government, executive or judicial, or in that particular executive department to which the duties of such officers appertain." (*Ex parte Siebold* (1880) 100 U.S. (10 Otto) 371, 397 [25 L.Ed. 717, 726].) Although interbranch appointments are not invariably proscribed, Congress's power to provide for such appointments is limited by "separation-of-powers concerns, which would arise if such provision for appointment had the potential to impair the constitutional functions assigned to one of the branches," and a provision for interbranch appointment likely would be improper if there were an "incongruity" between the functions normally performed by the appointing power and the exercise of the appointment authority. (*Morrison v. Olson* (1988) 487 U.S. 654, 675-676 [108 S.Ct. 2597, 2611, 101 L.Ed.2d 569]; see also *Springer v. Philippine Islands* (1928) 277 U.S. 189 [48 S.Ct. 480, 72 L.Ed. 845] [legislature of the Philippine Islands could not provide for legislative appointments to executive agencies].)

Although federal judges serving in courts established under article III of the federal Constitution are themselves the products of interbranch appointments (being appointed by the President, with the advice and consent of the Senate), their terms of office are limited only by "good behavior," and Congress may not reduce their salaries during their terms of office. (U.S. Const., art. III, § 1.) In this way, the Framers ensured that after appointment federal judges would be free from influence by their appointing authority: "The separation of powers concept as understood by the founding fathers assumed the existence of a judicial system free from outside influence of whatever kind and from whatever source . . . ." (Ervin, *Separation of Powers: Judicial Independence, supra,* 35 Law & Contemp. Probs. 108, 121.)

The California Constitution has no equivalent of the federal Constitution's appointments clause. But the federal experience is instructive in construing the separation of powers guarantee of the state Constitution. It is worth noting that, consistent with the federal Constitution's limitations on Congress's role in the appointment and removal of executive and judicial branch officers, the California Constitution gives the Legislature no role at all in the appointment of judges. Judges are elected by the voters, with the Governor having authority to fill vacancies by appointment. (Cal. Const., art. VI, § 16.)

Although the precise issue presented here has never arisen before in California, courts in other states have held that the legislative branch lacks authority to appoint or remove subordinate judicial officers and confidential judicial assistants. In *State v. Noble* (1889) 118 Ind. 350 [21 N.E. 244], for example, the Indiana Supreme Court struck down a statute granting the state legislature authority to appoint commissioners to assist the court in the performance of its duties, and granting the governor authority to appoint commissioners to fill vacancies. Explaining why these interbranch appointments violated the doctrine of separation of powers, the court said: "*A department without the power to select those to whom it must entrust part of its essential duties can not be independent.* . . . [¶] If it be conceded that the right to make choice of ministers and assistants for the court is a legislative power, then neither the judiciary nor the executive can limit its exercise, nor impose restraints upon the legislative discretion. . . . If this be so, then the Legislature may select any number of assistants, assign to them whatsoever duties they may see fit, give them access to the records of the court and surrender to them the right to share with it all labors and all duties. Surely, a court thus subject to legislative rule would be a mere dependent, without a right to control its own business and records. But a constitutional court is not subject to any such legislative control. The Legislature can not for any purpose cross the line which separates the departments and secures the independence of the judiciary. It is not the length of the step inside the sphere of the judiciary that summons the courts to assert their constitutional right and demands of them the performance of their sworn duty, for the slightest encroachment is a wrong to be at once condemned and resisted." (*Id.* at p. 357 [21 N.E. at p. 247], italics added.)

Summing up, the Indiana Supreme Court said: "[I]t can not be doubted that judicial power includes the authority to select persons whose services may be required in judicial proceedings, or who may be required to act as the assistants of the judges in the performance of their judicial functions, whether they be referees, receivers, attorneys, masters, or commissioners. [¶] . . . It was, as we have shown, a well known and fully recognized principle, that *courts should, as part of the judicial power, have the right to choose their own assistants, and the Constitution has secured and confirmed that principle beyond the power of the Legislature to shake it.*" (*State v. Noble, supra,* 118 Ind. 350, 360-361 [21 N.E. 244, 248], italics added.) This court quoted these very words with apparent approval in *People v. Hayne* (1890) 83 Cal. 111 [23 P. 1], upholding legislation reserving to this court the authority to appoint Supreme Court commissioners. Other state courts have similarly concluded that, just as the judiciary ordinarily may not appoint persons discharging executive or legislative duties (*Hutchins v. City of Des Moines* (1916) 176 Iowa 189, 212 [157 N.W. 881, 889], the legislative and executive

branches may not appoint or remove subordinate judicial officers or confidential judicial assistants (*Barland v. Eau Claire County* (1998) 216 Wis.2d 559, 589 [575 N.W.2d 691, 703]; *Witter v. Cook County Com'rs* (1912) 256 Ill. 616 [100 N.E. 148].)

## III

Because they raise serious separation of powers concerns, interbranch appointments must be carefully scrutinized and should be permitted only if there exists either a special justification for the interbranch appointing mechanism or particular safeguards to protect the appointee from extra-branch influence after appointment. Because here the proponents of the challenged law have shown neither a special justification nor particular safeguards, the challenged law is invalid.

An interbranch appointment would be justified if, for example, vesting the appointing power within the same branch in which the officer serves would implicate a conflict of interest. (See, e.g., *Morrison v. Olson, supra,* 487 U.S. 654, 677 [108 S.Ct. 2597, 2611-2612] [upholding law providing for judicial appointment of special prosecutor].) Consistent with this principle, the state Constitution provides for interbranch appointment of the members of the Commission on Judicial Performance, the body charged with disciplining judges. (Cal. Const., art. VI, § 8, subd. (a).) Of the commission's 11 members, this court appoints three, the Governor appoints four, and the legislative branch (by the Senate Committee on Rules and by the Speaker of the Assembly) appoints the other four. (*Ibid.*) But there is no comparable conflict of interest concern in the appointment of those charged with administering the attorney discipline system. Because judges are not members of the State Bar, this court's appointment of State Bar Court hearing judges poses no issue of bias or conflict of interest.

An interbranch appointment might also be justified if the appointee's duties were not purely executive or judicial or legislative, but of a combined or hybrid sort. Again, nothing like that has been demonstrated here. The duties of hearing judges involve supervising discovery, presiding at evidentiary hearings, and making written findings and recommendations. As the United States Supreme Court has explained, these duties "are quintessentially judicial in nature." (*Freytag v. Commissioner, supra,* 501 U.S. 868, 891 [111 S.Ct. 2631, 2645].)

Not only is there no special justification for interbranch appointment of State Bar Court hearing judges, the law at issue contains no safeguards to ensure that hearing judges appointed by the executive or legislative branches will be independent of their appointing authorities. During their terms of

office, hearing judges are removable only for cause in the same manner as other state judges presiding in courts established under article VI of the state Constitution. But hearing judges serve six-year terms, subject to reappointment for additional terms by the same appointing authority. Under these circumstances, hearing judges are necessarily subservient to their appointing authorities, which hold the power to determine whether they will continue in office. The Speaker of the Assembly, for example, could decline to reappoint, or threaten to decline to reappoint, a hearing judge who failed a political litmus test or who exercised judicial powers in a fashion unsatisfactory to the Speaker. (See *Bowsher v. Synar, supra,* 478 U.S. 714, 726 [106 S.Ct. 3181, 3187-3188].) This kind of political influence over the performance of judicial duties is constitutionally impermissible. Because hearing judges are subordinate judicial officers, they must owe their allegiance entirely to the judicial branch or to the voters, not to officers of the political branches of state government.

The majority suggests that appointment of hearing judges by members of the executive and legislative branches is permissible because hearing judges "operate only within a discrete arena . . . in which a significant degree of legislative regulation has been found permissible." (Maj. opn., *ante,* at p. 54.) I disagree. The Legislature acts within its proper sphere when it enacts legislation. The legislation may regulate the practice of law or the practice of medicine, or it may define crimes and prescribe punishments. Enacting laws of this character is quintessentially legislative in character. Within limits, the Legislature may also enact laws regulating judicial procedures. But when the Legislature has enacted the substantive law, and prescribed the procedure for its enforcement, it has ordinarily exhausted its legislative role. It may not also control the execution of the laws it has enacted or sit in judgment on persons accused of violating those laws. All judges, and indeed all executive officers, operate within arenas subject to a significant degree of legislative regulation through enactment of substantive and procedural laws. This legislative regulation provides no justification for legislative intrusion into the appointment of particular judicial officers.

The majority also suggests that interbranch appointment of hearing judges is permissible because hearing judges' decisions are subject to review in the Review Department, all of whose judges are appointed by this court. (Maj. opn., *ante,* at p. 54.) But it is no justification that the legislative and executive usurpation of the appointment process for the State Bar Court is not yet complete. To repeat the words of the Indiana Supreme Court, "[i]t is not the length of the step inside the sphere of the judiciary that summons the courts to assert their constitutional right, and demands of them the performance of their sworn duty, for *the slightest encroachment* is a wrong to be at

once condemned and resisted." (*State v. Noble, supra,* 21 N.E. 244, 247, italics added.)

Finally, the majority suggests that interbranch appointment of hearing judges by the political and executive branches is permissible because any appointees must first be found qualified by an independent entity whose members are appointed by the judiciary. (Maj. opn., *ante,* at p. 54.) But this kind of screening merely ensures that the appointee will possess minimum qualifications essential for the position. It does not reduce or eliminate the appointed officer's subservience to the appointing authority; reappointment will depend on pleasing the appointing authority, not the screening commission.

I conclude, accordingly, that appointment of hearing judges of the State Bar Court by the Senate Committee on Rules, the Speaker of the Assembly, and the Governor violates the separation of power provision of our state Constitution.

IV

The challenged provision deleting the position of lay judge in the Review Department also violates the principle of separation of powers. Ordinarily, the legislative branch may establish offices in the other branches and determine the minimum qualifications for those offices. But attorney discipline is a subject committed entirely to the judicial branch. Attorneys are officers of the court, and, as the United States Supreme Court has said, "it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed." (*Ex parte Secombe* (1856) 60 U.S. (19 How.) 9, 13 [15 L.Ed. 565].) The majority correctly recognizes that in attorney discipline matters our authority is primary and extends to the composition of the State Bar Court. (Maj. opn., *ante,* at p. 57.) Accordingly, statutes enacted by the Legislature dealing with the composition of the State Bar Court are properly considered recommendations that this court may accept or reject. In this instance, because there is no sound basis for eliminating the lay judge position in the Review Department, the recommendation should be firmly rejected.

In 1989, the American Bar Association created the Commission on Evaluation of Disciplinary Enforcement "to conduct a nationwide evaluation of lawyer disciplinary enforcement and to provide a model for responsible

regulation of the legal profession into the twenty-first century." (ABA, Lawyer Regulation for a New Century (1992) p. xi.) The commission continued the work of an American Bar Association committee formed in 1967 and chaired by retired United States Supreme Court Justice Tom Clark, a committee whose work this court has cited with approval. (See *Hustedt v. Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, 341.) In 1992, the House of Delegates of the American Bar Association adopted the commission's report. (ABA, Lawyer Regulation for a New Century, *supra,* at p. xi.) Regarding participation by nonattorneys in lawyer discipline, the commission recommended that "[a]t least one third . . . of all adjudicators should be nonlawyers." (*Id.* at p. 63.) The commission explained: "Over two thirds of the states have nonlawyer members sitting with lawyers to adjudicate disciplinary cases. The opinion of disciplinary counsel, lawyer members, and the courts of those states is that nonlawyers are a great benefit to the process. The presence of nonlawyers serves to assure the public that the disciplinary process is not a 'whitewash.' Nonlawyers bring a perspective that adds depth and breadth to the adjudication. [¶] The appointment of nonlawyers as disciplinary adjudicators has been the policy of the American Bar Association for twenty years. . . . The lack of nonlawyer adjudicators creates distrust among the public and provides a target for critics of judicial regulation of lawyers. . . . [¶] . . . [¶] Failing to include nonlawyer members increases suspicion that the profession is protecting its own. It denies the Court, the public, and the profession depth and quality in the adjudicative process." (*Id.* at pp. 63-64.)[1]

In 1993, the American Bar Association's House of Delegates adopted Model Rules for Lawyer Disciplinary Enforcement. The model rules provide for a statewide board and hearing committees to administer the attorney discipline system. (ABA, Model Rules for Lawyer Disciplinary Enforcement (1996) rule 2(A).) Public members constitute one-third of the board, which corresponds to the State Bar Court's Review Department. (*Id.,* rule 2(B).) The commentary to the Model Rules explains: "A combination of lawyers and nonlawyers on the board results in a more balanced evaluation of complaints. Currently more than two-thirds of all jurisdictions involve public members in their disciplinary structure. Participation by nonlawyers increases the credibility of the discipline and disability process in the eyes of

---

[1]The commission also recommended that "[r]egulation of the legal profession should remain under the authority of the judicial branch of government" (ABA, Lawyer Regulation for a New Century, *supra,* at p. 1) and that "[a]ll jurisdictions should structure their lawyer disciplinary systems so that disciplinary officials are appointed by the highest court of the jurisdiction or by other disciplinary officials who are appointed by the Court" (*id.* at p. 24). The commission found "no basis to believe that legislative regulation of lawyers *per se* would be an improvement over judicial regulation" and "no persuasive evidence that a system regulated by the judiciary is biased for respondent lawyers against complainants." (*Id.* at p. 5.)

the public. There is a human tendency to suspect the objectivity of a discipline body composed solely of members of the respondent's professional colleagues. Involving public members helps allay that suspicion." (*Id.,* com. to rule 2.)[2]

I find that reasoning persuasive. Public confidence is essential for the proper functioning of the attorney discipline system. One way to instill public confidence is to provide for nonattorney representation in the Review Department through the position of lay judge. A substantial majority of other jurisdictions use nonattorney adjudicators in their attorney discipline systems. In state boards regulating other professions, public members are invariably included, constituting at least one-third of the membership.[3] Here, the majority suggests no reason why we should defer to the political branches by eliminating the only nonattorney adjudicator in the State Bar Court. Therefore, I find the challenged law invalid insofar as it eliminates the position of lay review judge.

## V

We consider here a law that intrudes on this court's authority over attorney discipline by restructuring the State Bar Court to remove our authority to appoint three of the five hearing judges and by eliminating the position of lay review judge. The majority concludes that this law does not defeat or materially impair judicial authority (maj. opn., *ante,* at p. 57), and

[2]The principle of public representation in professional discipline is also embedded in the state Constitution's provisions for judicial discipline. The 11-member Commission on Judicial Performance, which administers the system of judicial discipline, consists of three judges, two attorneys, "and 6 citizens who are not judges, retired judges, or members of the State Bar of California . . . ." (Cal. Const., art. VI, § 8, subd. (a).)

[3]Representative statutory provisions providing for public members on state boards or committees administering disciplinary systems for various professions and occupations are the following: Business and Professions Code sections 1000-1 (State Board of Chiropractic Examiners: 2 of 7 members are public members), 1601 (Dental Board of California: 4 of 14 members are public members), 2001 (Medical Board of California: 7 of 19 members are public members), 2008 (Division of Medical Quality: 4 of 12 members are public members), 2230 (Division of Medical Quality panels: 2 of 6 members are public members), 2531 (Speech-Language Pathology and Audiology Board: 3 of 9 members are public members), 2603 (Physical Therapy Board of California: 3 of 7 members are public members), 2702 (Board of Registered Nursing: 3 of 9 members are public members), 2842 (Board of Vocational Nursing and Psychiatric Technicians: 6 of 11 members are public members), 2920 (Board of Psychology: 4 of 9 members are public members), 3320 (Hearing Aid Dispensers Examining Committee: 4 of 7 members are public members), 3711 (Respiratory Care Board of California: 4 of 9 members are public members), 4800 (Veterinary Medical Board: 3 of 7 members are public members), 5000 (California Board of Accountancy: 4 of 10 members are public members), 5514 (California Architects Board: 5 of 10 members are public members), and 6711 (Board for Professional Engineers and Land Surveyors: 7 of 13 members are public members).

that under this vague standard the law does not violate the separation of powers doctrine. In so concluding, the majority "underestimates the incremental effect of interbranch intrusions." (McCabe, *Four Faces of State Constitutional Separation of Powers: Challenges to Speedy Trial and Speedy Disposition Provisions* (1989) 62 Temple L.Rev. 177, 218.) As the United States Supreme Court has explained, "the doctrine of separation of powers is a *structural safeguard* rather than a remedy to be applied only when specific harm, or risk of harm, can be identified." (*Plaut v. Spendthrift Farm, Inc.* (1995) 514 U.S. 211, 239 [115 S.Ct. 1447, 1463, 131 L.Ed.2d 328].) It is a doctrine "establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." (*Ibid.*; see also *Bowsher v. Synar, supra,* 478 U.S. 714, 730 [106 S.Ct. 3181, 3190] ["The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty."].)

Although the law here challenged poses no immediate threat to liberty, it is an impermissible weakening of structural protections, and therefore a violation of the separation of powers doctrine. Justice Kennedy put it this way: "It remains one of the most vital functions of this Court to police with care the separation of the governing powers. That is so even when, as in the case here, no immediate threat to liberty is apparent. When structure fails, liberty is always in peril." (*Public Citizen v. Department of Justice* (1989) 491 U.S. 440, 468 [109 S.Ct. 2558, 2574, 105 L.Ed.2d 377] (conc. opn. of Kennedy, J.).)

For these reasons, I dissent.

Werdegar, J., concurred.

**BROWN, J.,** Dissenting.—The wanton pursuit of power is not a new problem. In his farewell address, George Washington warned "[t]he spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. A just estimate of the love of power and proneness to abuse it which predominates in the human heart is sufficient to satisfy us of the truth of this position." (Speeches of the American Presidents (Podell & Anzovin edits. 1988) p. 17.)

California government has never been immune to the spirit of encroachment. Writing in 1859, a decade after this court's founding, Justice Stephen J. Field responded to legislation requiring us to issue written opinions in all cases: "It is but one of many provisions embodied in different statutes by which control over the Judiciary department of the government has been

attempted by legislation. To accede to it any obligatory force, would be to sanction a most palpable encroachment upon the independence of this department. If the power of the Legislature to prescribe the mode and manner in which the Judiciary shall discharge their official duties be once recognized, there will be no limit to the dependence of the latter. . . . [¶] The truth is, no such power can exist in the Legislative Department or be sanctioned by any Court which has the least respect for its own dignity and independence. *In its own sphere of duties, this Court cannot be trammeled by any legislative restrictions.*" (*Houston v. Williams* (1859) 13 Cal. 24, 25, italics added.)

One hundred and forty years, seven generations, have come and gone, during which time this court has successfully labored to maintain the judiciary's self-respect. Yet, today's ruling marks the third time in as many months a majority has willingly ceded constitutional ground. (See *In re Rose* (2000) 22 Cal.4th 430 [93 Cal.Rptr.2d 298, 993 P.2d 956] [neither legislation establishing State Bar Court nor summary denial of judicial review in professional discipline case is unconstitutional]; *Leone v. Medical Board* (2000) 22 Cal.4th 660 [94 Cal.Rptr.2d 61, 995 P.2d 191] [Legislature can constitutionally limit appellate review of professional discipline by writ of mandate rather than direct appeal].)

The legislation examined here shows disrespect for this court as a coordinate branch of government. The majority's abject acceptance of such legislative impudence goes far beyond comity and cooperation. This is abdication.

## I

The doctrine of the separation of governmental powers, a principle embodied in the Constitutions of the United States and of most of the states, including California, is a structural means of thwarting tyranny by dividing political power, the better to resist its consolidation and abuse. Nevertheless, like that of many American high courts, our separation of powers jurisprudence has tempered formal doctrine with insights drawn from the pragmatic necessities of effective government. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." (*Youngstown Co. v. Sawyer* (1952) 343 U.S. 579, 635 [72 S.Ct. 863, 870, 96 L.Ed. 1153] (conc. opn. of Jackson, J.).) We have, in short, practiced a sensible doctrine of shared powers, rather than strictly separated powers.

In an area of regulation where the practical reality of the activities of the regulated class implicates legitimate interests of more than one department

of government, recognizing the utility of a shared jurisdiction makes eminently good sense. But shared jurisdiction should be distinguished from officious intermeddling. In the interest of ensuring workable government and avoiding interbranch conflicts, each branch needs to exercise self-discipline, showing institutional restraint and a respect for constitutional limits. As then Professor Felix Frankfurter explained: "The dominant note" in separation of powers jurisprudence "is respect for the action of that branch of the government upon which is cast the primary responsibility for adjusting public affairs. The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory." (Frankfurter & Landis, *Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers* (1924) 37 Harv. L.Rev. 1010, 1016, italics in original; see also Levin & Amsterdam, *Legislative Control Over Judicial Rule-Making: A Problem in Constitutional Revision* (1958) 107 U. Pa. L.Rev. 1; Note, *The Inherent Power of the Judiciary to Regulate the Practice of Law—A Proposed Delineation* (1976) 60 Minn. L.Rev. 783.) Once this obvious point is acknowledged—that the activities of government are such that at times departmental functions blur—the mature solution to the threat of interbranch conflicts is a pragmatic, respectful give-and-take, adjusting the powers of a department relative to another so that functions deemed basic to one are not trenched upon by another.

Our own cases exhibit just such an effort to accommodate legitimate legislative interests in the judicial sphere. We have upheld, for example, legislation fixing the compensation paid court employees (*Millholen v. Riley* (1930) 211 Cal. 29 [293 P. 69]), prescribing the conditions under which judges may be disqualified (*Johnson v. Superior Court* (1958) 50 Cal.2d 693 [329 P.2d 5]), and fixing the punishment for contempt of court (*In re McKinney* (1968) 70 Cal.2d 8 [73 Cal.Rptr. 580, 447 P.2d 972]). Given that much of what attorneys do in contemporary California society is of legitimate interest to the Legislature under its broad police powers, we have also approved legislation prescribing criteria for admission to the bar (*Brydonjack v. State Bar* (1929) 208 Cal. 439 [281 P. 1018, 66 A.L.R. 1507]), and regulating attorney fees (*Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920 [211 Cal.Rptr. 77, 695 P.2d 164]). (See also *In re Attorney Discipline System* (1998) 19 Cal.4th 582 [79 Cal.Rptr.2d 836, 967 P.2d 49].)

Yet equally, and even emphatically, when legislation trammeled on core judicial functions, we did not hesitate to strike it down on separation of powers grounds. Indeed, we aggressively defended the perimeter of our

constitutionally conferred territory, on occasion going so far as to invalidate legislation with little impact on the operations of the courts.[1] (See, e.g., *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329 [178 Cal.Rptr. 801, 636 P.2d 1139] [statute authorizing administrative agency to discipline attorneys appearing before it void as violating separation of powers]; *Katz v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 353 [178 Cal.Rptr. 815, 636 P.2d 1153] [same]; cf. Wolfram, Modern Legal Ethics (1986) § 2.2.3, pp. 27-28 & fn. 53.)

Regrettably, the legislation before us lacks any sense of constitutional restraint. Here, we deal not with such matters as regulation of attorney fee arrangements or administrative operation of the courts. (Cf. *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53-58 [51 Cal.Rptr.2d 837, 913 P.2d 1046] [legislative declaration of unpaid furlough days on which trial courts are not in session does not facially violate separation of powers].) Instead, the subject—the naming and vetting of judicial officers—lies close to the heart of the courts' function and implicates the "longstanding Anglo-American tradition of an independent Judiciary" (*United States v. Will* (1980) 449 U.S. 200, 217 [101 S.Ct. 471, 482, 66 L.Ed.2d 392]; see also *Northern Pipeline Co. v. Marathon Pipe Line Co.* (1982) 458 U.S. 50, 58 [102 S.Ct. 2858, 2864-2865, 73 L.Ed.2d 598]). Why? Because "[a] Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." (*United States v. Will, supra,* 449 U.S. at pp. 217-218 [101 S.Ct. at p. 482].)

The vice of this statute is not so much that it raises palpable concerns that biased or even corrupt judges will be appointed by the legislative or executive departments—that is at least a possibility under any appointment process, including the one by which article VI judges are chosen. But, by arrogating to themselves the staffing of a disciplinary tribunal we have repeatedly referred to as our "administrative assistant[s]" (see, e.g., *In re Attorney Discipline System, supra,* 19 Cal.4th at p. 600; *Lebbos v. State Bar* (1991) 53 Cal.3d 37, 47-48 [278 Cal.Rptr. 845, 806 P.2d 317]; *Emslie v. State Bar* (1974) 11 Cal.3d 210, 224 [113 Cal.Rptr. 175, 520 P.2d 991];

---

[1]Robert C. Fellmeth, formerly the Legislature's special State Bar discipline monitor, has characterized legislative and executive branch involvement in the bar disciplinary function in California as "perhaps . . . unprecedented . . . ." (Third Progress Report of the State Bar Discipline Monitor (1988) p. 99.) Yet in his 1988 progress report, Mr. Fellmeth rejected the notion of executive or legislative appointments to the State Bar Court: "[I]n 33 states," he wrote, "the state supreme court appoints not only the adjudicators, but also the commission overseeing the entire disciplinary system operation, including investigations and trial counsel. . . . [¶] Perhaps, more importantly, this is a judicial position and one unique to the very special jurisdiction of the Supreme Court." (*Id.* at pp. 99-100.)

*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 557 [216 Cal.Rptr. 367, 702 P.2d 525]; *Jacobs v. State Bar* (1977) 20 Cal.3d 191, 196 [141 Cal.Rptr. 812, 570 P.2d 1230]; *Brotsky v. State Bar* (1962) 57 Cal.2d 287, 301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310]), the Legislature and the executive infringe this court's most basic prerogative. What does it say about the constitutional independence of the judiciary if the Legislature can deprive us of the power to choose our own subordinates?

The majority suggest this legislation may nevertheless be upheld because review of State Bar Court Hearing Department (Hearing Department) rulings will remain the task of the State Bar's Review Department (Review Department), whose judges remain our appointees (for now, at least) and, ultimately, by this court. (Maj. opn., *ante*, at pp. 54-56.) But judicial control cannot practically be divorced from the power to find facts. Alone, the power to resolve ultimate issues of law is insufficient to ensure a thorough-going judicial independence because the essence of the decisionmaking process includes factual determinations: "And of course making impartial decisions in individual cases requires control over fact-finding as well as law-declaring. In the run of the mill case, the facts are everything." (Strauss, *Article III Courts and the Constitutional Structure* (1990) 65 Ind. L.J. 307, 309.) Because these two components of the judicial function are inextricably intertwined, the Legislature cannot devolve one to itself without violating the separation of powers doctrine.

Our own State Bar precedents reflect this same reality. Although the recommendations of the Hearing Department judges do not bind us, we give them " 'great weight.' " (*In re Menna* (1995) 11 Cal.4th 975, 984 [47 Cal.Rptr.2d 2, 905 P.2d 944].) Because we do not conduct hearings, "[t]he findings of the hearing panel have long been accorded significant weight, inasmuch as the hearing judge is in the best position to weigh intangibles such as credibility and demeanor." (*Id.* at p. 985.) Given that practical necessity, it is by no means clear that a tribunal consisting of administrative judges with political ties to the other two departments of government can be squared with the notion of judicial independence. It ought to go without saying that, "[b]y freeing . . . judges from continuing review by appointing authorities, conflicts of interest are minimized. An independent judiciary is the hallmark of the constitutional state." (Verkuil, *Separation of Powers, the Rule of Law and the Idea of Independence* (1989) 30 Wm. & Mary L.Rev. 301, 308.)[2]

---

[2]A famous incident in federal constitutional history—the "court-packing" plan of the mid-1930's that so riled the nation—may make the point more sharply than any legal analysis. Although not exact, the parallel to this case is not inapt. What was feared was the

## II

There is a second reason why the legislation petitioners attack here fails to pass muster, one not derived from abstract theory but tied instead to pertinent precedents of this court. In *In re Lavine* (1935) 2 Cal.2d 324 [41 P.2d 161, 42 P.2d 311], an attorney was disbarred after being convicted of attempted extortion. Later, he applied to be reinstated, invoking a pardon conferred by the Governor and the "pardon statute" purporting to restore all rights to those so pardoned. (*Id.* at p. 326; see Stats. 1933, ch. 945, § 1, p. 2476.) We denied his application, holding the statute "unconstitutional and void as a legislative encroachment upon the inherent power of this court to admit attorneys to the practice of the law and . . . tantamount to the vacating of a judicial order by legislative mandate." (*Lavine*, at p. 329.) In *Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724 [147 Cal.Rptr. 631, 581 P.2d 636], the petitioner engineering firm sought mandate permitting it to appear in a municipal court civil action through a corporate officer who was not an attorney, relying on a statute authorizing such appearances. We denied relief, saying it was "established without serious challenge that legislative enactments relating to admission to practice law are valid only to the extent they do not conflict with rules for admission adopted or approved by the judiciary" (*id.*, at pp. 728-729), and again invalidated the law as " 'the vacating of a judicial order by legislative mandate.' " (*Id.* at p. 728, quoting *In re Lavine, supra,* 2 Cal.2d at p. 329.) And in *Hustedt v. Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, the Workers' Compensation Appeals Board began contempt proceedings against the petitioner-attorney arising out of an administrative hearing, relying on a provision of the Labor Code. We granted the attorney's petition for mandate restraining the board's action, concluding the statute did not displace our exclusive jurisdiction to suspend or remove attorneys. (*Id.* at p. 344.)

This case, too, falls within the rule we announced in *Lavine* and have since applied to invalidate legislation vacating our orders. The 1988 legislation establishing the State Bar Court provided that statutory procedures for the appointment of judges of the State Bar Court are to be followed "unless otherwise directed by the Supreme Court." (Bus. & Prof. Code, § 6079.1, subd. (c).) In 1991, this court adopted rule 961 as a Rule of Court (hereafter all undesignated rules references are to the California Rules of Court). The rule prescribes in detail procedures for the evaluation and nomination of

perceived attempt by one department of the federal government—the executive—to undercut the constitutional independence of another department—the judiciary—by expanding the size of the United States Supreme Court. The widespread anxiety over the plan was not provoked by the idea of presidential appointment, but by the public's felt sense that the administration, unhappy with the high court's jurisprudence in matters social and economic, was in effect attempting to overthrow the court as a coordinate department of government, swamping its membership with new appointees handpicked by the administration.

judges to the State Bar Court. In 1995, in response to concerns that the appointment of State Bar judges by the bar's board of governors raised substantial conflict of interest problems, we amended rule 961 to establish an Applicant Evaluation and Nomination Committee, empowering it to solicit and evaluate applications for appointments and reappointments as State Bar Court judges. The rule specifies the composition of the committee, provides that it serves at the court's pleasure, and directs it to adopt, with our approval, procedures for the selection process. (Rule 961(a).) Through the rule, we have reserved the right to extend the terms of incumbent judges and provide for staggered terms (rule 961(c)), and, over the course of the last few years, have done so several times.

The legislation challenged by petitioners in this proceeding failed to carry forward the specific legislative recognition of our inherent power to direct a different appointment process. Instead, the new legislation vests without qualification the appointive power over three of the five Hearing Department judges in the Speaker of the Assembly, the Senate Rules Committee, and the Governor. The measure, in other words, purports to delete this court's authority to adopt its own procedures for the selection and retention of State Bar Court judges despite our express ruling that the "reserved judicial power over admission and discipline" was "critical to the constitutionality of the State Bar Act." (*In re Attorney Discipline System, supra*, 19 Cal.4th at p. 600.) The challenged legislation not only invades a subject which, in both substance and history, has belonged wholly to the judiciary, it sweeps aside—"vacates"—the rule we have adopted for conducting our own business. It is equivalent to this court's appointing the membership of legislative committees. Because the legislation substantially compromises our inherent power to adopt an appointment procedure of our own devising and changes the rules under which our own house is governed, it violates the separation of powers doctrine. (*Chambers v. NASCO, Inc.* (1991) 501 U.S. 32, 43 [111 S.Ct. 2123, 2132, 115 L.Ed.2d 27], quoting *United States v. Hudson* (1812) 11 U.S. (7 Cranch) 32, 34 [3 L.Ed. 259, 260] [" '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others' "].)

### CONCLUSION

Dissenting in *Baker v. Carr* (1962) 369 U.S. 186, 267 [82 S.Ct. 691, 737-738, 7 L.Ed.2d 663], Justice Frankfurter noted a court's authority "ultimately rests on sustained public confidence in its moral sanction" and that confidence is nourished by the judiciary's "complete detachment, in fact and in appearance, from political entanglements . . . ." Who can doubt that,

by upholding the law at issue here, the majority blithely welcomes into the judiciary's own household the specter of "political entanglement" in one of its core functions—the appointment and reappointment of judicial officers, of, in a word, . . . judges.

James Madison said of the separation of powers that it was a "political maxim." (Madison, The Federalist No. 47 (Kramnick edit. 1987) p. 302.) He meant, I think, that while the phrase itself is a formula, or an aspiration, its success as an operative principle depends upon the skill with which the political game is played out among the departments of government. The preservation of a viable constitutional government is not a task for wimps. We cannot, as the majority seem to suppose, simply defer to the violation of the Constitution. The struggle for judicial supremacy—not primacy, but supremacy—within the courts' constitutional domain is unending. Unending because, as Washington understood, it derives from the human heart. With the decisions of this term, the ceaseless struggle to preserve the independence of the judiciary—a struggle that is a constitutional obligation of this court—has been placed at risk. With "earnest heart and troubled mind[,] hav[ing] sought gropingly but honestly for what was best for [our] day," I dissent. (Jackson, The Struggle for Judicial Supremacy (1941) p. xvi.)